LOUIS M. BUBALA III, ESQ.   ELECTRONICALLY FILED ON
Nevada State Bar #8984     AUGUST 26, 2013
Armstrong Teasdale LLP
50 W. Liberty St., Ste. 950
Reno, NV 89501
Telephone: (775) 322-7400
Facsimile: (775) 322-9049
Email: lbubala@armstrongteasdale.com

Attorney for Creditor
Experience Based Learning, Inc.

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) CASE NO.: BK-N-13-50833-BTB |
| | ) |
| WORLD BOTANICAL GARDENS, INC. | ) Chapter 11 |
| | ) |
| Debtor. | ) **OBJECTION TO DEBTOR'S MOTION** |
| | ) **TO SELL SUBSTANTIALLY ALL OF** |
| | ) **DEBTOR'S ASSETS** |
| | ) |
| | ) Hearing Date: August 28, 2013 |
| | ) Hearing Time: 10:00 a.m. |
| | ) |

Creditor EXPERIENCE BASED LEARNING, INC. ("EBL"), an Illinois corporation objects to Debtor's Motion to Sell Substantially All of Debtor's Assets (Dkt. 76).

### I. INTRODUCTON

1. This proposed asset sale should be rejected. The insiders have mortgaged Debtor's real property to the hilt and have siphoned money from Debtor's profitable businesses to pay back their loans. Now, the very same insiders seek to purchase all of Debtor's assets free and clear of all liens for substantially less than they are worth.

2. Due to the self-dealing between Debtor and the buyers, this deal is subject to heightened scrutiny by this Court. As such, Debtor is required to disclose, among other things, the circumstances under which the negotiations have taken place, any marketing efforts, and the factual basis upon which the debtor determined that the price was reasonable. Debtor has failed to provide this information. In fact, the entire Motion is based exclusively on self-serving testimony by one of the buyers, who purports to speak on behalf of the Debtor.

3.     Additionally, the alleged sound business justifications for this sale are based on speculation and are not supported by the record.

4.     At a minimum, there should be an independent third-party to analysis the value of the assets before a sale of substantially all of Debtor's assets is approved.

5.     Alternatively, EBL is willing to purchase the Debtor's assets used to operate the zip line tour free and clear of all lines for $100,000, subject to EBL obtaining acceptable financing and subject to EBL's acceptance of and the assignment of the land lease related thereto.  This would leave the estate with another profitable business (*i.e.*, the Segway tour) and the real the real property (which is mortgaged exclusively with insider debts).

## II. BACKGROUND

6.     EBL provides installation, consultation, training, and maintenance services for zip line and canopy tours.  EBL has consulted on, installed, and designed zip line tours domestically and internationally.

7.     On April 4, 2009, EBL entered into a Contract/Service Agreement ("EBL Contract") with the Debtor, World Botanical Gardens, Inc. ("Debtor").  A true and correct copy of the EBL Contract is attached hereto and made a part hereof as Exhibit "1".

8.     Pursuant to the EBL Contract, EBL was to install a zip line course for Debtor near Debtor's garden operations in Hakalau, Hawaii, and to provide ongoing services for zip line tours including inspections, re-certifications of staff, and certifications of new staff.  EBL also provides marketing services to Debtor and allows Debtor to use certain EBL proprietary information pursuant to the EBL Contract.

9.     EBL constructed the zip line tour and performed its other obligations under the EBL Contract.

10.     EBL and Debtor considered themselves to be partners in the operation of the zip line tour and have worked together on all aspects of the operation of the zip line tour.

11.    EBL originally built the zip line tour for Debtor at cost with the expectation of receiving the monthly payments under the Contract for several years.  The monthly payments were critical to the financial relationship between EBL and Debtor.

12.    EBL and Debtor have worked closely on the operations of the zip line tour.

13.    Despite the lack of information regarding the proposed transaction, one important item the Debtor disclosed is that the zip line tour and the Segway tour the insiders seek to purchase have been profitable.  (Dkt. 76, ¶ 4).  In fact, in 2012, the zip line generated $485,000 in revenues, and $70,000 to $90,000 in net operating income.  (*Id*. at ¶ 20).

14.    Despite the profitability of the zip line tour and the Segway tour, Debtor's success has been hampered by its debt obligations to the secured creditors, <u>which are the same insiders who are now attempting to purchase all of Debtor's assets</u>.  (Dkt. 76, ¶¶ 4-5).

### III.  PROCEDURAL BACKGROUND

15.    On April 30, 2013, Debtor filed its Petition for Chapter 11 Bankruptcy.

16.    On August 16, 2013, Debtor filed a Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan, (Dkt. 72), and a Motion to Extend Time to Assume or Reject Unexpired Leases of Non-residential Real Property. (Dkt. 74).

17.    On August 18, 2013, Debtor filed its Motion to Sell Substantially All of Debtor's Assets, (Dkt. 76) (the "<u>Motion</u>"), and an *Ex Parte* Motion for Order Shortening Time on the Motion.  (Dkt. 78).

18.    On August 19, 2013, this Court ruled on Debtor's *Ex Parte* Motion to Shorten Time and ordered that objections to the Motion must be filed by August 26, 2013, and the hearing on this matter would be held on August 28, 2013.  (Dkt. 84).

19.    EBL objects to the Motion for the reasons set forth below.

### IV.  ARGUMENT

20.    In order for this sale to be approved, Debtor bears the burden of proving it has satisfied the requirements of Section 363(f), and the transaction was undertaken in good faith

pursuant to Section 363(m). *See In re Jim L. Shetakis Distributing Co.*, 415 B.R. 791, 796-797 (D. Nev. 2009) (applying Section 363 to a debtor in possession); 11 U.S.C. § 363.

21.    Furthermore, since the proposed transaction is outside the ordinary course of Debtor's business and prior to the Chapter 11 plan being confirmed, the Debtor must also prove there is a sound business justification for the transaction. *E.g., In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011); *In re Wilde Horse Enterprises, Inc.*,136 B.R. 830, 842 (Bankr. C.D. Cal. 1991) (collecting cases).

22.    Whether the proffered business justification is sufficient depends on the facts of the case and this Court "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re ASARCO, L.L.C.*, at 601.

23.    In this case, insiders are attempting to purchase substantially all of Debtor's assets.  Therefore, this proposed sale must be reviewed by this Court under heightened scrutiny. *See e.g., In re Medical Software Solutions*, 286 B.R. 431, 455 (Bankr. D. Utah 2002); *In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009); *In re Summit Global Logistics, Inc.*, Case No. 08-11566, 2008 WL 819934, *9 (Bankr. D.N.J. March 26, 2008) (collecting cases).

24.    Due to the risk of collusion, Debtor "must fully disclose to the court and creditors the relationship between the buyer and seller, as well as the circumstances under which the negotiations have taken place, any marketing efforts, and the factual basis upon which the debtor determined that the price was reasonable." *In re Wilde Horse Enterprises, Inc.*,136 B.R. 830, 842 (Bankr. C.D. Cal. 1991).

25.    As set forth below, Debtor has not shown the absence of collusion or a supported business reason for the sale.  Debtor has also failed to fully disclose the negotiations that have taken place and the factual basis for determining the price.

26.    The proposed sale, as set forth in the Motion, suffers from several deficiencies as set forth more fully below.

### A.  Summary of the Proposed Asset Sale

27.    Debtor has failed to provide a written offer related to the proposed transaction. The following summary is based on the Motion and the self-serving affidavit of Mark Robinson tendered in support thereof.

28.    According to the Motion, Steve Bryant ("Bryant"), the Debtor's CEO and Chairman of its Board of Directors, and Mark Robinson ("Robinson"), the Debtor's CFO and Director, have made an offer to purchase substantially all of Debtor's assets.  (Dkt. 76, ¶ 22).

29.    In summary, Bryant and Robinson, through a new entity called BWA LLC, agree to assume Debtor's secured debts, pay the known unsecured creditors, and pay the bankruptcy estate $10,000.

30.    According to the Motion, the prospective buyer, BWA LLC, will not be acquiring or assuming any liability with respect to the EBL Contract, unless "[t]he agreement are modified and accepted by BWA LLC prior to closing."  (Dkt. 76, ¶ 25).

31.    BWA LLC will likewise not be assuming Debtor's agreement with Segway Hawaiian.  (Dkt. 76, ¶ 25).

32.    BWA LLC will likewise not be assuming any of Debtor's liabilities to Walter Wagner.  (Dkt. 76, ¶¶ 13, 26).  Mr. Wagner is allegedly owed back pay in an amount excess of $500,000.  (Dkt. 76, ¶ 13).

33.    Furthermore, it is unclear what assets BWA LLC is seeking to purchase.  The Motion lists certain personal property of the Debtor. (Dkt. 76, ¶ 7).  The list, however, is incomplete.  For example, it does not include the personal property used to operate the zip line tour, the intangible assets associated with the zip line tour, or the goodwill associated with the zip line tour.  However, Debtor claims it would be selling all the goodwill and intangibles associated with the zip line tour business.  (Dkt. 76, ¶ 23).

### B.  Self-Dealing

34.    The most notable concern regarding the proposed sale is that it is between the Debtor and its principals.  The proffered buyers, Mark Robinson and Steve Bryant, are insiders.

(Dkt. 76, ¶ 22). They are also secured creditors with liens on the real estate owned by Debtor. (*Id*. 76, ¶ 11).

35. The remaining mortgage holders are also insiders. (Dkt. 76, ¶ 11). Gold Oak Developers Inc. is an insider. (*Id*. at ¶ 36). Bryant Properties LLC appears to be associated with Steve Bryant, given that Debtor has scheduled both Mr. Bryant and Bryant Properties at the same address in Amery, Wisc. (Dkt. 12 at Sch. D, Bryant Props.; Dkt. 14, Sch. F. at Page 4 of 5, Mr. Bryant). Leslie Cobos is also an insider, as she is a member of the Board of Directors. (Dkt. 42, SOFA ¶¶ 3(c), 21(b)).

36. The only secured creditors that are not insiders are Central Pacific Bank with a loan secured by a van, and Kubota Credit with a loan secured by a tractor.

37. In fact, according to the Motion, 96% of the Debtor's secured debts are owed to insiders. (*Id*. at ¶ 11).

38. Stripping away the debts to the insiders (and assuming *arguendo* the values in the Motion are accurate), **BWA LLC is providing $110,416.10 in consideration for assets worth $672,924.07**.

39. Even if one discounts the value of the real estate (again removing the debts to the insiders and assuming *arguendo* the values in the Motion are accurate), BWA LLC is providing $110,416.10 in consideration for assets allegedly worth $283,587.07.

40. According to the Debtor, its entire business was valued at $1,019,000, less than two years ago. (Dkt. 76, ¶ 15).

41. For its own purposes, Debtor misrepresented the offer from EBL. Debtor alleges EBL offered to pay $100,000 and 2% of its revenues for the zip line tour assets alone. (Dkt. 76, ¶ 20). This is incorrect.

42. EBL actually made two offers to purchase the zip line tour. EBL offered to purchase the zip line tour for $150,000 payable over two years, plus 2% of EBL's revenues from the zip line tour. EBL also offered to purchase the zip line tour for $100,000 payable over two years, plus 2% of EBL's revenues from the zip line tour. Under this second offer, EBL

6

promised to spend at least $50,000 in upgrade to the zip line tour to increase the value of the ongoing payments.  Under both offers, EBL promise to increase the monthly payment to 5% of the gross revenues from the zip line tour once the visitor center is expanded to include restrooms.

43.    EBL stands ready to purchase Debtor's assets used to operate the zip line tour free and clear of all liens for $100,000, subject to EBL obtaining acceptable financing and subject to EBL's acceptance of and assignment of the land lease related thereto.

44.    As noted above, the zip line generated $485,000 in revenues and $70,000 to $90,000 in net operating income.  (*Id*. at ¶ 20).

45.    If the zip line tour alone is worth $100,000 and the Segway tour business is profitable, then the sale price offered by BWA LLC is substantially insufficient.

### C. Insufficient Information

46.    The entire Motion is based on self-serving testimony by the buyer, who purports to speak on behalf of the Debtor.  At a minimum, there should be an independent third-party to analysis the value of the assets before a sale of substantially all of Debtor's assets is approved.

47.    Debtor has also failed to provide information regarding the negotiations that preceded this offer and how the sale price was determined.

48.    Debtor has also failed to provide the written offer setting forth the terms of this sale, which is allegedly worth $927,718.61.  (Dkt. 76, ¶ 1).

49.    Based on the information provided by the Debtor, EBL and the other creditors are unable at this time to determine whether Debtor's statements regarding the value of the assets and liabilities are accurate.

50.    As noted above, it is unclear what assets are being sold.  At a minimum, the zip line tour and its related tangible and intangible assets are not listed on Debtor's personal property.  (Dkt. 76, ¶ 7).

51.     Likewise, at this point, the Court has not been informed when or how the secured debts were created.  It may well be that these purported secured debts owed to the insiders were preferences, fraudulent conveyances, or suffer from some other legal impairments.

52.     What is clear is that the Debtor and its principals, Bryant and Robinson, have negotiated a deal with themselves and are seeking Court approval without any of the required disclosures.

### D.  Improper/Opportunistic Timing

53.     The Debtor claims BWA LLC's bid "assumes or pays off all of Debtor's unsecured debts, leaving Debtor free and clear of liens and encumbrances."  (Dkt. 76, ¶ 37). This is not correct for two reasons.  First, EBL is scheduled as an uncontested unsecured creditor (Dkt. 14, Sch. F, Page 2 of 5), yet this proposed sale does not include payment for EBL. (Dkt. 76, ¶ 12).  Secondly, at this time, it is unclear as to who the unsecured creditors are and the amounts of their claims, as the deadline for filing proofs of claims does not run until September 3, 2013.  EBL has not yet filed its proof of claim, and the sale does not provide for payment to EBL or any other unsecured creditors who still may be filing proofs of claims. (Dkt. 76, ¶ 12).

54.     This poorly timed Motion is essentially a plan of liquidation, but it does not satisfy the requirements of a Chapter 11 reorganization plan.  For example, the Motion does not "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C.A. § 1123(a)(3).

55.     Instead of filing a plan of reorganization within 120 days of filing, as Debtor is obligated to under the Code (11 U.S.C. § 1121(b)), Debtor filed a Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan (Dkt. 72), a Motion to Extend Time to Assume or Reject Unexpired Leases of Non-residential Real Property (Dkt. 74), and the most recent Motion to Sell Substantially All of the Debtor's Assets.  (Dkt. 76).

56.     This is an overt end-run around of Debtor's obligation to propose a plan of reorganization and smacks of stealing a corporate opportunity.  Debtor should propose this sale

through the auspices of a comprehensive plan, which will deal with all of Debtor's creditors and should be subject to a full disclosure statement hearing.

**E. Lack of Sound Business Justification for the Sale**

57.     Despite Debtor's biased, self-serving, and naked assertions to the contrary, nothing in the Motion indicates the continued operation of the business is contingent upon the completion of this proposed sale.  Debtor argues that if this sale is not confirmed, Debtor will have to "clos[e] its doors."  (Dkt. 78, ¶ 3, Dkt. 76, ¶ 34).

58.     Notably, Debtor points out that "the end of Debtor's business season is already here," which indicates operations will be slowed down if not ceased until next season.  (Dkt. 78, ¶ 3).

59.     There is no evidence on the record that Debtor will have to "close its doors" if its assets are not sold.  Even Mr. Robinson's self-serving testimony does not support this conclusion. He testified that he recently sought leave of Court to pay operating expenses.  (Dkt. 77, ¶ 6).  He also testified that the business operated at a profit in 2010.  (*Id.*).

60.     Likewise, Debtor has not provided a sufficient explanation of why the sale of the business is necessary to keep the zip line lease, its Segway license, and vendor agreements.  (Dkt. 76, ¶ 34).

61.     Debtor has failed to explain why it would have to refund amounts prepaid by customers if Debtor's assets were not sold and the business was forced to "clos[e] its doors."  (Dkt. 76, ¶ 34).

62.     Debtor's claims that its reputation, competitive position, and potential to resell its assets will be harmed if it is forced to close operations is also speculative.  (Dkt. 76, ¶ 34).

**F.  Insufficient Marketing of Assets**

63.     The Debtor claims this offer to purchase the assets "is a rare opportunity" and "does not anticipate another offer that affords the same benefits."  (Dkt. 76, ¶ 33).  However, the Debtor also admits there has been some interest in its assets.  For example, as noted above, EBL has offered to purchase the assets associated with Debtor's zip line tour.

64.    Debtor has provided no details or unbiased testimony regarding the recent alleged attempts to sell its businesses. At this time, the Court does not know if the negotiations with National Botanical Gardens, the botanical gardens in Hilo, Hawaii, or the competing zip line business ever resulted in any offers from the prospective purchasers.  All the Court knows is that "they declined."  (Dkt. 77, ¶¶ 17-19).  The Court is left to guess at whether that means the prospective buyer declined to negotiate, declined Debtor's offer, or declined after several rounds of negotiation.

65.    Debtor claims it recently approached a broker that would not list Debtor's business because "it had no value" since it was not profitable.  Once again, Debtor fails to provide the details or unbiased testimony regarding this transaction.  It is clear, however, that the zip line tour and the Segway tours businesses are profitable.  (Dkt. 76, ¶ 4).

66.    Debtor also claims it approached its mortgage holders to see if they would be interested in a debt-for-equity swap at a discount.  Purportedly, the "mortgage holders" rejected the offer.  (Dkt. 76, ¶ 21).  This is a strange turn of phrase considering Debtor's principals and Debtor's "mortgage holders" are the same people.  (Dkt. 76, ¶¶ 11, 22).

**V.  CONCLUSION**

67.    For the reasons set forth above, the sale should be denied at this early juncture in the bankruptcy and Debtor should be ordered to submit a plan for reorganization.

WHEREFORE, EXPERIENCE BASED LEARNING, INC., an Illinois corporation, prays this Court deny Debtor's Motion to Sell Substantially All of Debtor's Assets (Dkt. 76), and for such other and further relief as it deems equitable and just.

DATED this 26th day of August, 2013.

ARMSTRONG TEASDALE

By: /s/ Louis M. Bubala III
        Louis M. Bubala III
        Counsel for Creditor, Experience
        Based Learning

10

# EXHIBIT 1

# EXHIBIT 1



**Experience Based Learning**

www.EBL.org

## CONTRACT/ SERVICE AGREEMENT

This Agreement is made this _ day of April 2009, by and between Experience Based Learning, Inc. an Illinois corporation, whose mailing address is 3634 Laura Lane, Rockford, IL 61114 (herein "EBL"), and World Botanical Gardens, Inc., a Nevada corporation, whose mailing address is PO Box 324, Honomu, HI 96728 (herein "Owner").

WHEREFORE, in mutual consideration of the terms, covenants and conditions set forth in this Agreement, EBL and Owner do hereby agree as follows:

*Section 1*

*Effective Date*

This agreement shall become effective when executed by both parties.

*Description of Project*

The "Project" consists of a four- or five- stage Zip Line Canopy Tour ("Zip Line Tour") (which includes an additional approximately 100' Suspension Bridge), as well as associated building plans, specifications, constructions drawings, site maps, safety equipment, professional reports, business plans, marketing strategies, training manuals, operating manuals and other materials, supplies, tools and equipment as may be developed and as is reasonably necessary to design, construct, complete and commercially operate said Zip Line Canopy Tour as described more fully in this Agreement and depicted on the Site Plan attached as Exhibit A to this Agreement, which is hereby incorporated as part of this Agreement.

The Project will be located entirely on property owned, leased and/or controlled by Owner near its garden operations in Hakalau, Hawaii as further described in Exhibit A to this Agreement. It is intended that Owner will enter into a license for adjacent property with Richard Alderson, et al. prior to issuing a Notice to Proceed ("Licensed Property").

*Notice to Proceed*

Owner acknowledges that EBL staff members work on-site installing projects for substantial periods of time and are often booked months in advance. EBL acknowledges that Owner cannot issue a written request to EBL to commence work ("Notice to Proceed") until it obtains all permits which are required prior to the commencement of construction. EBL shall use its best efforts to begin Work within 120 days of receipt of an Initial Deposit in the amount set forth in Section 2.2 of this Agreement and a Notice to Proceed from Owner after receipt by Owner of final approval of a Special Use Permit for the Zip Line Tour and associated facilities by the Hawaii County Planning Commission. For this purpose "Work" means engineering, ordering of materials, retaining labor and

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org


**www.EBL.org**

other necessary expertise needed to complete the Zip Line Tour, and otherwise preparing to advance construction of the Zip Line Tour. If Owner does not issue a Notice to Proceed on or before two hundred seventy (270) days from the Effective Date, this Contract shall terminate, unless extended in writing by both Owner and EBL, and Owner and EBL shall be relieved of any obligation hereunder other than Owner's obligations under *EBL Proprietary Rights*.

### Time is of the Essence

Subject to the understandings in the Notice to Proceed section, EBL acknowledges that time is of the essence. Once EBL initiates construction work on site, EBL will use its best efforts to complete installation of the Zip Line Tour and associated facilities according to industry standards as described in Sections 1.1 to 1.5 on Owner's property within 90 days.

In the event EBL does not use its best efforts, Owner shall be entitled to a reduction in fees owed EBL of 1% of Gross Receipts for each month, or pro rata portion thereof, completion of the project is delayed beyond 90 days. For example, if completion is delayed for an additional two (2) months, then the payment shall be reduced from 15% to 14% for the first two (2) months of operation.

### Services to be Provided by EBL

1.      EBL shall design, develop, construct and deliver a turn key Project (recognizing that EBL will need to undertake ongoing and periodic modifications to the course after it is operational as the course "settles") to Owner upon completion of the Project free of any liens, encumbrances, security interests, or other claims of any kind other than EBL's license fee.

2.      EBL has provided Owner with a preliminary cost estimate for designing and constructing the Project and providing the associated services provided for in this Agreement of $185,000.00.

3.      Within 30 days of execution of this Agreement EBL will provide to Owner complete Plans and Design Specifications for the project, which shall be subject to approval by Owner. Once Owner has approved Plans and Design Specifications EBL may make expenditures up to an amount not to exceed $5,000.00 without Owner's approval as long as they are consistent with the approved Plans and Design Specifications.

4.      EBL's Design Specifications, including a complete list of building materials and Project components, shall be attached to, and thereby become a part of, this Agreement as Exhibit C.

5.      EBL will provide to Owner a Final Cost Estimate (not to exceed the preliminary cost estimate of $185,000.00 by more than 15%, as adjusted by the cost of a fifth stage, if requested by Owner) of the costs of constructing the Project and providing the services and equipment (including 30 days of travel to Hawaii by EBL officials to oversee and manage construction of the Project) described below to Owner within 45 days of execution of this Agreement, unless Owner requests a change in the Project.

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org



www.EBL.org

6.      Unless objected to by Owner within 10 days for reasonable cause, EBL's Final Cost Estimate will be attached to, and thereby become a part of, this Agreement as Exhibit B.

### *Scope of Work*

Installation of as short as possible two pole zip tower with stairs and hand rails, IBC 2003 compliant, with associated decks.  This tower will feed into the first zip line approximately 300' or less in length and terminate with a ground landing on the far side.  Clearing of limbs would be required.

Installation of a zip line starting on the ground and landing on the ground just down gorge from zip one by approximately 150' away.  Clearing of limbs would be required.

If Owner requests that the Zip Line Tour begin on the South side of the stream and EBL concurs that an additional zip running South to North is feasible and compatible with the remainder of the planned Zip Line Tour, EBL agrees to construct a zip that runs from the North side of the stream to the South side at a location to be agreed upon by Owner and EBL.  Clearing of limbs would be required.  Owner recognizes that EBL has advised Owner that such a change/addition would increase the cost and Owner agrees to be responsible for the increased cost.

Installation of a suspension bridge roughly 100' in length and will transport participants back to the far side of the gorge.  This bridge will include dual safety cables for clip in points and be designed and constructed so as to be capable of being secured from use by trespassers or the general public other than supervised guests of Owner with locked gates at either end of the bridge.  This bridge will be designed to carry a minimum of a four person limit or roughly 3,200 pounds capacity.

Installation of a zip line about a 300-500' foot walk away from the end of the bridge which then starts on the ground and lands on the ground.  Clearing of limbs would be required.

The final zip will be one of two options, depending upon the topography of the land.  The first and ideal option would be to run the zip line off the side of the self guided nature trail for roughly 1,800 feet, down towards the visitor center.  If the land in between these two points will not permit for such a long zip, the second option is to go straight off the edge towards the access road and be roughly 1,000 feet long.  Both zips would be great, but option one is the targeted goal and ideal.

EBL shall be responsible for managing and directing all aspects of Project construction, installation, and completion in a timely and professional fashion excluding any work to be provided by WBGI.

### *Materials / Equipment For Project Construction*

At Owner's expense, EBL shall be responsible for the ordering and purchase of all equipment for the installation to include wire rope, wire rope clips, utility poles, shipping, screws, bolts and other hardware, rope, safety equipment, Bobcats, augers, ground anchors, tools to include cutters, chain pullers, wrenches, tension meters, work crew, generators, rental equipment such as chain saws, generators, drills, and other materials and equipment needed to construct and operate the Project safely.

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org


www.EBL.org

EBL agrees that any equipment, materials or other items purchased for the Project (other than EBL's tools) shall be Owner's property, free and clear of any liens, encumbrances, security interests, or other claims of any kind.

During the term this Agreement is in effect, EBL shall repair or replace as appropriate, at owners expense, any wire rope, tool, materials, or equipment needing repair or replacement (but not covered by warranty) for safe operation of the project at EBL's actual cost of effecting such repairs or replacement.

### Engineering and other Professional Services

As necessary, EBL shall retain, at Owner's expense, the services of a Professional Engineer or other professionals licensed in Hawaii to provide engineering or other services needed to obtain all necessary building and related permits and to complete the Project.

### Construction by Licensed Contractor

If necessary, at Owner's expense, EBL shall construct the Project using a Contractor licensed in Hawaii or Owner shall complete the Project through Owner as Owner-Builder with EBL serving as Owner's Project Manager.

### Compliance with Permit and Other Requirements

Owner shall be responsible for informing EBL of all Hawaii and local permit and licensing requirements. Thereafter, EBL shall assure that EBL, and its agents and employees, shall be in full compliance with all permits, conditions, rules, laws and regulations which apply to the design, construction and operation of the Project.

### Staff Training

EBL shall provide minimum qualifications (e.g., height, weight, physical strength, etc) for a person to successfully serve as a Project tour guide.

After Project Completion, but before Commercial Operation, EBL shall provide first year training for up to ten staff or tour guides to be hired by Owner. This training shall include a minimum of three days of training addressing operations, safety practices, practice tours, rescues, a written test, "tricks of the trade" lessons, and a minimum of ten sets of training, operations and maintenance manuals.

Owner shall pay EBL's reasonable travel costs for lodging for up to 5 days, meals, airline ticket(s) and rental car if EBL must make a separate visit to the site to provide training and labor (the labor of Steve Gustafson shall be excluded as the parties intend for Steve Gustafson to attempt to coordinate inspections while onsite for training).

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org



www.EBL.org

### Safety Equipment for Operations

As part of the costs to be paid by Owner as specified in Section 2 below, EBL shall provide to Owner at least 14 days prior to project completion 40 sets of Safety Equipment to be used by visitors to the Project including helmets, harnesses, safety lanyards, carabiners, zip pulleys, rescue bags with extra rope, pulley, belay devices, harness, cutting shears, and other equipment necessary to operate the Project safely.

### Marketing Services

EBL shall work with Owner, at Owner's expense, if requested by Owner to develop a marketing strategy intended to enhance the success of the operation of the Project to potentially include image graphics, advertising, rack cards, website integration, and other marketing techniques EBL uses for its other projects.

### Section 2 Payments

### Payments by Owner for Construction of the Project

1.      Owner shall pay EBL in current funds for the performance of work, out of pocket costs for materials, equipment, labor and supplies as follows:

a.              a $10,000.00 deposit upon issuance of this agreement.  The $10,000 shall be utilized by EBL, in whole or in part, to reimburse EBL for time and expenses related to site visits, travel expenses, and legal fees;

b.              a $25,000.00 advance payment ten (10) days of the issuance of a Notice to Proceed on the Project to be held in trust by EBL for the benefit of Owner for the payment of invoices as received from EBL and approved by Owner for payment by EBL from the advance payment account.  Owner recognizes that in order for EBL to render construction services timely and economically that from time to time EBL may request prior approval for purchases.  In which case, Owner agrees to promptly and reasonably act upon the requests of EBL.  Additionally, as to purchases less than $5,000, if EBL is unable to obtain Owner approval in a timely manner under the circumstances, EBL shall have discretion to make the purchase without prior Owner approval;

c.              Owner shall advance funds in $25,000.00 increments within five days of depletion of the proceeding $25,000.00 to be held in trust by EBL for the payment of invoices as received from EBL and approved by Owner for payment by EBL from the advance payment account.  Owner recognizes that in order for EBL to render construction services timely and economically that from time to time EBL may request prior approval for purchases.  In which case, Owner agrees to promptly and reasonably act upon the requests of EBL.  Additionally, as to purchases less than $5,000, if EBL is unable to obtain Owner approval in a timely manner under the circumstances, EBL shall have discretion to make the purchase without prior Owner approval;



*Experience Based Learning*

www.EBL.org

d.        EBL and Owner expect the project to require approximately $25,000 advances (up to a maximum of the Final Cost Estimate), less the $10,000 initial deposit, as adjusted by any additional costs approved by Owner.

e.        "Project Completion" means that the County of Hawaii has issued a certificate of occupancy for the Project and the project is otherwise ready for commercial operation.

f.        Upon the issuance of certificate of occupancy and the receipt of final invoices detailing EBL's total actual Project costs, Owner shall pay EBL a Reconciliation Amount within 30 days of receipt of such invoices of and unpaid costs, and such amount shall be the amount equal to all unpaid out of pocket expenses of EBL in completing the Project. In the event that Owner has paid EBL sums in excess of the actual Project costs, EBL shall reimburse Owner for such overpayment. If EBL fails to do so, Owner may reduce payments owed to EBL from Project Gross Receipts by any remaining unused balance.

2.        Owner agrees to pay interest of 1.5% per month beginning the same month payment is due, plus any and all collection costs including attorney's fees and other costs.

### *Payments by Owner After Commercial Operation*

1.        Owner shall make monthly payments to EBL on or before the 15th of each month as follows:

a.        Twelve percent (12%) of the previous month's Project Gross Receipts as long as Owner operates a Zip Line Tour anywhere on property owned, leased and/or controlled by Owner on or near its garden operations in Hakalau, HI, including, but not limited to, the Licensed Property.

i.        "Project Gross Receipts" means all receipts derived from the Zip Line Tour excluding (A) ticket sales and other revenue earned by Owner exclusively from its garden or other business operations; and (B) any sales tax, excise tax, or other transaction tax imposed by the State of Hawaii or any political subdivision of the State on such receipts. Owner agrees that it will account for Project Gross Receipts for the use of the Zip Line Tour separately from (A) and that Owner expects to charge for use of the Zip Line Tour separately from (A). If Owner desires to exclude any portion of revenue received as a result of ticket sales for (A) combined with the use of all or a portion of the Zip Line Tour, then Owner must first obtain the written approval of EBL as to that portion of the revenue to be allocated between Project Gross Receipts and other operations.

ii.        "Project Gross Receipts" does not include merchandise or other revenue in excess of ticket sales Owner may obtain as a result of operating the Project.

b.        During the Exclusivity Period three percent (3%) of the proceeding month's Project Gross Receipts.


www.EBL.org

**Experience Based Learning**

i.      "Exclusivity Period" means the two year period beginning on the first day of the month after the Project begins Commercial Operation during which time EBL agrees not to perform [installation] services for any other person or entity on the Big Island of Hawaii without Owner's written permission.

ii.     "Commercial Operation" means the date the Owner begins taking paying visitors on Project tours.

iii.    Owner may extend the Exclusivity Period for an additional year by giving written notice to EBL of its intent to extend the Exclusivity Period at least 30 days before the Exclusivity Period would otherwise end.

### *Owner's Option to Buy Out EBL's Interest*

Owner may buy out EBL's right to receive a portion of Project Gross Receipts at any time five years after the project begins Commercial Operation by paying EBL an amount equal to twelve percent (12%) of Project Gross Receipts multiplied by the total of the highest two years of operations (based upon rolling twelve month periods for each year), at which time EBL's right to receive a portion of Project Gross Receipts shall be reduced to seven percent (7%) of Project Gross Receipts for an additional ten years, at which point EBL's right to receipt any payment from the Project shall cease. The monthly payment provided for under *"Payments by Owner After Commercial Operation"* shall continue until this buyout is paid and upon payment the monthly payment shall be reduced to seven percent (7%). Upon Buyer's exercising its buy out right, EBL shall be relieved of any further obligation to provide services or assistance to Owner under this Agreement.

### *Section 3  Confidentiality*

All information provided in Section 1 & 2 of this contract is confidential. Owner must have written permission from authorized EBL personnel to share Section 1 & 2 information with any person, agency or company that provides competitive services with EBL, Inc.

### *Section 4  Standards and Warranties*

EBL shall design, construct, and supply materials to the Project that meet the applicable Professional Ropes Course Association (PRCA) installation standards for safe operation of ropes courses and zip lines.

Construction will carry a one year warranty on labor and metal hardware supplied by EBL. Lumber products are not included in this warranty of materials.

EBL is not responsible for vandalism, war, riots or acts of God, to include, but not be limited to, earthquakes, tornadoes, hurricanes, wind  storms, thunderstorms, or insect infestation, resulting in course damage.

**Experience Based Learning**



**www.EBL.org**

### *Section 5 Owner's Additional Obligations*

Owner shall provide ground clearing as needed to complete construction of walking paths.

Owner shall provide electricity to construction location as needed to complete construction.

During a period of two (2) years after the commencement of Commercial Operations, EBL shall provide professional technical safety and equipment inspections and recommendations for the Project's physical components semi-annually at no charge except for the reasonable costs of labor (the labor of Steve Gustafson shall be excluded as the parties intend for Steve Gustafson to attempt to coordinate inspections while onsite for training) airfare, meals and lodging for a period not to exceed a five day.  Thereafter, Owner may purchase such inspection services from EBL at EBL's cost of providing such services.

Owner shall indemnify and hold harmless EBL, its agents and employees from and against all claims, damages, losses and expenses that are attributable to the negligent use or operation made of the Project by the Owner.

EBL shall save, indemnify and hold harmless Owner from and against any and all claims, actions, proceedings, damages, costs, personal injury, and property damage arising out of, caused by, related to or connected with, the negligent design, construction, inspection, maintenance of the Project, the Equipment, training, and any breach of warranty, express or implied.

Owner shall not compete with EBL directly or indirectly in the operation of a Zip Line Tour during the term  of this Agreement and for five (5) years after the termination of this Agreement without written permission from EBL.

The Owner shall not directly or indirectly, solicit, recruit, induce, or coerce, any EBL employee, or individual or business which supports EBL to provide services to Owner.  This non-solicitation provision shall continue for so long as EBL provides services to Owner and for five years thereafter.

Within fifteen (15) days of the end of each month, and along with delivery of any payments owed to EBL, Owner shall furnish EBL with business records and copies of reservation information which identify, at a minimum, a daily accounting of the number of consumers utilizing the Zip Line Tour and the Project Gross Revenues received by Owner.  EBL shall retain such documents in confidence and shall not disclose, disseminate or publish the information contained therein except in conjunction with its rights under this Agreement.  Owner also agrees to provide a copy of such documentation to any financial institution with which EBL may from time to time seek financing, upon written request therefore.  At its sole cost and expense, EBL may request a third party financial audit of the Zip Line Tour for purposes of validation and/or filing of EBL tax returns.

EBL shall not directly or indirectly, solicit, recruit, induce, or coerce and employee or agent of Owner, to provide services to EBL. This non-solicitation prohibition shall continue for so long as Owner uses EBL's services under this Agreement, and for a period of five years thereafter.

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org



**www.EBL.org**

*Additional Services*

EBL agrees to provide additional services to Owner as may be requested by Owner from time to time at EBL's then prevailing wholesale rates and terms for such services, unless otherwise agreed by both parties.

These additional services may include installation of additional zip line segments, additional training, marketing, additional foot bridges, or other services EBL may agree to provide to Owner.

EBL shall not directly or indirectly, solicit, recruit, induce, or coerce, any Owner employee, or individual or business which supports Owner's business activities to provide services to EBL

Owner shall not directly or indirectly, solicit, recruit, induce, or coerce, any EBL employee, or individual or business which supports EBL's business activities to provide services to Owner.

*Section 6 Miscellaneous Provisions*

*Insurance*

EBL shall secure and maintain liability insurance through Project Completion in an amount no less than $1 million per occurrence.  EBL shall name Owner as an additional insured on such policies.  EBL shall provide proof of insurance to Owner before initiating work on the Project.

Owner shall secure and maintain liability insurance for the Project in an amount no less than $1 million per occurrence.  Owner shall name EBL as an additional insured.  Owner shall provide proof of insurance to EBL annually.

*Notices*

If to Owner, any Notice provided for under this Agreement shall be provided by registered mail to:

**World Botanical Gardens, Inc.**
PO Box 324
Honomu, Hawaii 96728

If to EBL, Notice provided for under this Agreement shall be provided by registered mail to:

**Experienced Based Learning, Inc.**
3634 Laura Lane
Rockford, Illinois 61114

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org



www.EBL.org

### Collateral Assignment of License

Attached hereto is a draft of the license for the Licensed Property. Notwithstanding any other provision to the contrary, EBL shall not be obligated hereunder in any manner until a license has been obtained by the Owner on terms and conditions substantially consistent with the draft License.

Owner agrees to notify EBL promptly if it receives notice from the owner of Licensed Property that Owner or any Owner affiliate is in default of the license. Owner agrees that EBL shall have the right to cure any default in the performance of the license. Owner agrees that EBL shall have a claim on Zip Line Project Gross Receipts for reimbursement of any costs EBL may incur in curing any such default and agrees that it will not make cash disbursements from Project Gross Receipts less (A) payments to continue operations, and (B) payments of debt service on any debt associated with the Zip Line Tour for any other purpose until Owner has reimbursed EBL for such costs in full.

### EBL Proprietary Rights

Owner acknowledges and agrees that EBL has expended significant resources and invested a substantial amount of time to develop processes, ideas, techniques, plans, and other information not generally available to the public regarding the layout, design, construction, operation, and marketing of zip line tours ("EBL Proprietary Information"). Owner acknowledges and agrees that the EBL Proprietary Information is a valuable economic asset that has enabled EBL to develop an extensive reputation and to establish long term business relationships with other parties, such that if Owner were to utilize any EBL Proprietary Information other than in accordance with this Agreement, EBL would suffer irreparable harm, loss and damage. Accordingly, Owner agrees that all EBL Proprietary Information shall remain the sole and exclusive property of EBL. If this Agreement terminates for any reason, other than in accordance with its expressed terms, or if Owner fails to perform its obligations under this Agreement, Owner shall have no rights in EBL Proprietary Information and shall have no right to use EBL Proprietary Information either at this location or elsewhere.

Owner agrees, without limiting any of the other remedies to EBL, that any actual or threatened violation of these covenants relating to EBL Propriety Information may be enjoined or restrained, including through a temporary restraining order or emergency, preliminary, or final injunction after EBL has obtained such relief pursuant to the Emergency Injunctive Relief arbitration procedure (relating to obtaining a temporary restraining order or a preliminary injunction) or normal arbitration procedure described in this Agreement, as appropriate. Notwithstanding any other provision of this Agreement, Owner agrees that an arbitrator shall have jurisdiction to entertain any such motions and authority to issue appropriate injunctive relief that may be subsequently enforced by any court of competent jurisdiction.



*Experience Based Learning*

www.EBL.org

### Assignment

EBL acknowledges and agrees that Owner may assign all or a portion of its interests in the Project to another legal entity that Owner expects will own and operate the Project for Owner. Notwithstanding such assignment, Owner shall continue to be responsible for its obligations under this Agreement, if not performed by an assignee.

EBL may not assign any part or portion of its obligations under this Agreement to any person or entity without the written consent of Owner. Unless otherwise agreed by Owner, all work to be performed by EBL under this Agreement shall be performed or supervised by Steve Gustafson.

### Compliance with Laws

EBL agrees that it shall perform services and other work anticipated by this Agreement according to applicable laws, rules, and regulations (including any conditions contained in any Special Permit, Building Permit or related permit or approval issued for the Project), by the State of Hawaii, any State agency with jurisdiction over the Project or services to be provided under this Agreement, the County of Hawaii, or any other State or local agency with jurisdiction over the Project or services to be provided under this Agreement.

### Governing Law

This agreement is subject to and governed by the laws of the State of Hawaii without giving effect to the State of Hawaii's conflict of interest laws.

### Dispute Resolution

A party that believes it is aggrieved under this Agreement shall provide notice of the dispute to the other party setting forth the nature of the dispute, the basis for believing the aggrieved party is entitled to relief, and the relief requested.

The parties shall engage in good faith negotiations for at least 30 days to resolve any disputes that may arise under this Agreement before a party may initiate an arbitration proceeding.

The parties agree that the objective of dispute resolution is to achieve a speedy, fair, and appropriate resolution of any disputes that may arise for the least cost to both parties. The parties agree to work together in good faith to serve these goals should any dispute arise under this agreement

If the dispute is not resolved through good faith negotiations, the aggrieved party shall retain a mediator acceptable to both parties who is a licensed attorney in any state, who shall work with both parties for another 30 days to help resolve the matter to the satisfaction of both parties. The cost of the mediator shall be born equally by both parties.



**Experience Based Learning**

www.EBL.org

Any dispute arising under this Agreement not resolved through mediation shall be submitted to binding arbitration before a neutral arbitrator acceptable to both parties in Reno, Nevada, including any dispute for which injunctive relief is necessary or appropriate.

Before initiating arbitration, an aggrieved party who believes it is less costly to arbitrate a dispute in some other location than Reno, Nevada may ask the mediator to decide whether it is less costly to both parties to hold the arbitration in either Hilo, Hawaii or Rockford, Illinois, taking into account the burden on both parties and their witnesses to travel to a location other than Hilo, Hawaii. In rendering its decision the mediator shall take into account legal fees; travel costs of principals, witnesses and attorneys for both parties; the cost of the arbitrator; lost work time for potential witnesses; costs of any expert witnesses; other costs of arbitration, and the location of pertinent records. The mediator shall have the authority to resolve this question within 10 days of receiving argument in writing from both parties.

If the parties cannot agree on an arbitrator within 30 days of notice by one party of its intent to initiate arbitration, either party may petition the Circuit Court in Reno, Nevada, to appoint an arbitrator, or an appropriate court of competent jurisdiction in Hilo, Hawaii or Rockford, Illinois should the arbitration be held in one of these locations. Nothing in this Agreement shall prevent the parties from agreeing to arbitrate a dispute in some other location.

Except as provided in this Agreement, the arbitration shall be governed by the Commercial Arbitration Rules published by the American Arbitration Association.

The cost of the arbitrator shall be born equally by both parties. The arbitrator shall award attorneys fees and costs to the prevailing party in an amount not to exceed $25,000.00 for attorneys fees and $10,000.00 for costs.

Any arbitration award is final and not subject to appeal except as may be allowed under the Federal Arbitration Act.

### *Emergency Injunctive Relief*

EBL may not seek damages, injunctive, declaratory, or other equitable relief from any court.

Notwithstanding any other provision of this agreement, after notice to Owner of its intent to do so, EBL may ask a court of competent jurisdiction in Rockford, Illinois to appoint a neutral arbitrator who is an attorney licensed in Illinois for the exclusive purpose of hearing a motion by EBL to issue a temporary restraining order or preliminary injunction to enforce covenants in this Agreement relating to the improper use of EBL Propriety Information by Owner.

Owner shall be entitled to appear before the arbitrator to challenge the granting of any such relief.

EBL may only seek a permanent injunction or other appropriate relief through the normal arbitration proceedings described in this Agreement.

Accredited Vendor: Professional Ropes Course Association (PRCA) www.prcainfo.org



**Experience Based Learning**

www.EBL.org

*Integration*

This Agreement sets forth the entire Agreement of the parties and all understandings, agreements, and provisions between the parties are included within its terms.

*Interpretation*

Both parties acknowledge that they have had the opportunity to consult with counsel in preparing this Agreement. Thus, no provision shall be construed against the drafter of that provision.

Headings in this Agreement are for convenience of the parties only, and are not to be used to interpret the Agreement.

This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Hawaii.

*Counterparts*

This Agreement may be executed in counterparts by each party.

*Agreed*:

4-4-2009 _____ Date

Steven R. Gustafson, Date
President / CEO – EBL, Inc.
F.E.I.N. # 36-4219567

4-10-09 _____ Date

Ken Francik
CEO and President
World Botanical Gardens, Inc.